UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN G., | Case No.:  21cv1691-KSC |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 12] AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [Doc. No. 15]** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

On September 9, 2021, plaintiff Steven G. commenced an action pursuant to Title 42, United States Code, Section 405(g), against Kilolo Kijakazi, the acting Commissioner of Social Security, seeking review of a final adverse decision of the Commissioner. [Doc. No. 1.]  Currently before the Court is plaintiff's Motion for Summary Judgment [Doc. No. 12] and defendant's Opposition and Cross-Motion for Summary Judgment [Doc. No. 15].  Plaintiff has also filed a Reply.  [Doc. No. 16.]

For the reasons outlined more fully below, the Court finds that plaintiff's Motion for Summary Judgment must be DENIED [Doc. No. 12].  The Court also finds that defendant's Cross-Motion for Summary Judgment must be GRANTED [Doc. No. 15].

/ / /

/ / /

## I.   *Background and Procedural History.*

Plaintiff filed applications for Social Security disability insurance benefits and supplemental income benefits on August 8, 2018, alleging he was disabled as of June 21, 2014, and had stopped working on this date because of his medical condition.  [Doc. No. 11-5, at pp. 2-10.]  Later, plaintiff changed his "alleged onset date" to January 29, 2019. [Doc. No. 11-2, at p. 33.]

At the time of his application, plaintiff claimed he was disabled by chronic congestive heart failure and knee pain.  [Doc. No. 11-6, at p. 15.]  Plaintiff's application for benefits was denied on December 20, 2018.  [Doc. No. 11-4, at pp. 2-5.]  He then submitted a request for reconsideration on February 27, 2019, which was denied on July 23, 2019.  [Doc. No. 11-4, at pp. 7, 9-13.]

On September 23, 2019, plaintiff requested a hearing, and a hearing was then held before an ALJ on July 22, 2020.  [Doc. No. 11-4, at p. 16; Doc. No. 11-2, at p. 102.]  A supplemental hearing was held on October 16, 2020.  [Doc. No. 11-2, at p. 50.]  In a written decision dated November 17, 2020, the ALJ concluded plaintiff is not eligible for disability benefits, because he is not disabled under Social Security regulations.  [Doc. No. 11-2, at p. 42.]  Plaintiff then requested review of the ALJ's decision by the Appeals Council, but the Appeals Council concluded in a letter dated August 13, 2021, that there is no basis for changing the ALJ's decision.  [Doc. No. 11-2, at pp. 2-5.]  Therefore, the ALJ's denial became the final decision of the Commissioner.

On September 29, 2022, plaintiff filed his Complaint in this action seeking review of the ALJ's decision.  [Doc. No. 1.]  Plaintiff then filed a Consent to jurisdiction for all purposes by the undersigned Magistrate Judge.  [Doc. No. 5.]

## II.   *Standards of Review.*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin*., 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if

supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

### III.    *The ALJ's Decision.*

Preliminarily, the Court notes that the ALJ's decision states as follows:  "The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2015.  Thus, the claimant must establish disability on or before that date to be entitled to a period of disability and disability insurance benefits."[1]  [Doc. No. 11-2, at p. 34.]

The ALJ followed the Commissioner's five-step sequential evaluation process for determining whether an applicant is disabled under this standard.  20 C.F.R. § 404.1520(a).  Together, Steps 1 and 2 constitute "a *de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  At steps one and two, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since his "amended alleged onset date" of January 29, 2019, and he has the severe impairments of congestive heart failure; hidradenitis suppurativa; and right knee pain.  The ALJ also concluded that plaintiff's anemia and depression did not qualify as severe impairments.  [Doc. No. 11-2, at p. 36.]  "An impairment is not severe if it is

---

[1]    As noted above, plaintiff's application for disability benefits said he was disabled as of June 21, 2014, and had stopped working on this date because of his medical condition.  He later amended his disability "onset date" to January 29, 2019, even though this amended date is after December 31, 2015, his date last insured.  [Doc. No. 11-5, at pp. 2-10.]

merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p). The ALJ did conclude plaintiff has mild limitations in understanding and remembering written and spoken instructions; interacting with others; concentrating, persisting, and maintaining pace; and handling stress and changes in routine, but the ALJ indicated these "mild" impairments do not have any more than a minimal impact on plaintiff's ability to do basic work activities. [Doc. No. 11-2, at pp. 36-37.]

At step three, the ALJ concluded that plaintiff's impairments, whether considered alone or in combination, do not meet or equal any of the relevant listings in the SSA's Listing of Impairments. [Doc. No. 11-2, at p. 37.]

At step four, the ALJ must determine the claimant's residual functional capacity to work based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). Residual functional capacity (RFC) is "the most [an applicant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). As part of this assessment, the ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).

Here, the ALJ concluded plaintiff has the residual functional capacity "to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." [Doc. No. 11-2, at p. 41.] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are

///

additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Based on the testimony of a vocational expert, the ALJ concluded plaintiff is unable to perform any of his past relevant work as a deck hand; fishing boat captain; or delicatessen worker, which was performed as a composite job consisting of a store laborer (medium work), sandwich maker (medium work), and cashier (light work). [Doc. No. 11-2, at p. 41.]

If the applicant cannot perform past relevant work, the ALJ at step five must consider the residual functional capacity assessment, along with the applicant's age, education, and work experience, to determine whether the applicant could "make an adjustment to other work" that is available in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 1382c(a)(3)(B). While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

The ALJ's decision indicates he relied on the following at step five: (1) Plaintiff is "closely approaching advanced age;" (2) plaintiff has a limited education of eleven years; (3) plaintiff has the residual functional capacity for light work; (4) the vocational expert testified that an individual of plaintiff's age and education who could lift and carry 20 pounds occasionally and 10 pounds frequently and sit, walk or stand for 6 hours in a day could work as a cashier; and (5) plaintiff worked in a composite job that involved being a cashier/checker, where he acquired "directly transferable semi-skills." [Doc. No. 11-2, at p. 41.] These skills included use of math, service orientation, use of equipment (a cash register), and product inspection. [Doc. No. 11-2, at pp. 41-42.]

Additionally, the ALJ's decision indicates he considered the "Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2." [Doc. No. 11-2, at p. 42.] Based on the above-referenced factors and "direct application" of the Medical-Vocational Guidelines," the ALJ concluded plaintiff is not disabled, because he can perform the job

/ / /

of cashier/checker, which is available in significant numbers in the national economy. [Doc. No. 11-2, at p. 42.]

### IV.   *The Administrative Record.*

#### A.   *Summary of the Administrative Hearings.*

##### 1.   *Plaintiff's Testimony.*

###### a.   *July 22, 2020 Hearing.*

Plaintiff testified that he is almost 56 years old.  He completed the 10th grade and some vocational training to be a captain on a boat.  He has been out of work for about 5 to 6 years, but he used to be employed full time as a captain on sport fishing boats.  [Doc. No. 11-2, at p. 105.]  He can no longer work on fishing boats because of fatigue and sleepiness from chronic and acute congestive heart failure and the medication he takes to treat this condition.  [Doc. No. 11-2, at pp. 106-107.]  Although he is not taking any medication for it, he also struggles with some depression because he is unable to work and do other things he could do in the past.  [Doc. No. 11-2, at p. 108.]

Plaintiff further testified that he could lift and carry 5 to 7 pounds but tires very easily.  [Doc. No. 11-2, at p. 109.]  Currently, he is only able to sit for 15 to 20 minutes because he is dealing with hidradenitis suppurativa, a skin disease he has had his whole life, but he will be having surgery soon.  [Doc. No. 11-2, at pp. 110, 116.]  If there are no hills, he can walk a couple of blocks, but he stops to catch his breath after about 5 minutes.  During the day, he lays down to rest for 3 to 4 hours.  [Doc. No. 11-2, at pp. 110-111.]  He has friends that help him, is on Medi-Cal, and receives food stamps.  [Doc. No. 11-2, at p. 111-112.]

###### b.   *Supplemental Hearing on October 16, 2020.*

Plaintiff testified he had surgery for his hidradenitis suppurativa since the last hearing.  He also said he needs a complete replacement of his right knee due to osteoarthritis and severe pain.  He indicated he is in the process of scheduling that surgery.  [Doc. No. 11-2, at pp. 52-53.]  He can only stand on his knee for 15 to 20 minutes and cannot lift more than 10 pounds.  [Doc. No. 11-2, at p. 53.]  Plaintiff also

testified that he is still taking medication for his congestive heart failure and still experiences fatigue which prevents him from walking long distances.  [Doc. No. 11-2, at pp. 53-54.]

### 2. *Vocational Expert's Testimony.*

#### a. *July 22, 2020 Hearing.*

The vocational expert, Kenneth Ferra, testified that plaintiff's prior job as a fishing captain is classified as medium skilled work and his prior job as a deckhand is classified as heavy semi-skilled work.  There are no skills from these jobs that are transferable to sedentary or light work.  [Doc. No. 11-2, at pp. 117-118, 120.]

Plaintiff also worked as a cashier, which is unskilled work, so the vocational expert testified there were no transferable skills from this job to any jobs at the sedentary level.  [Doc. No. 11-2, at pp. 117-118.]  However, plaintiff was then asked to describe his work as a cashier at a delicatessen, and he indicated he did not just work at the cash register.  He took orders; made sandwiches; cleaned; unloaded and loaded trucks; and took care of the inventory.  The heaviest items he had to lift were 30- to 50- pound boxes of soda syrup.  [Doc. No. 11-2, at pp. 121-122.]  The vocational expert then indicated this appeared to be a "composite job between a stock clerk and a sandwich maker."  [Doc. No. 11-2, at p. 122.]  A cashier who makes sandwiches is classified as medium unskilled work, and the stock clerk position also involves a medium level of exertion as it was performed.  [Doc. No. 11-2, at p. 122.]

Next, the vocational expert was asked if an individual of plaintiff's age and education, who could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for six hours in a workday; had no postural, manipulative, communicative, environmental, or visual limitations, could perform any of plaintiff's prior work.  [Doc. No. 11-2, at pp. 118-119.]  She testified that such an individual could work as a cashier.  [Doc. No. 11-2, at p. 119.]

/ / /

/ / /

### 2.   *Supplemental Hearing on October 16, 2020.*

Vocational expert, Gloria Lasoff, offered testimony at the supplemental hearing on October 16, 2020.  Ms. Lasoff identified plaintiff's past relevant work as a deck hand (heavy); a fishing captain (medium); and a compositive job that involved being a cashier, sandwich maker, and stock clerk.  [Doc. No. 11-2, at pp. 54-55.]  The vocational expert testified she would categorize the stock clerk part of the job as a store laborer, which is considered medium work, as performed.  [Doc. No. 11-2, at pp. 55-56.]  The sandwich maker part of the job is also considered medium work, but the cashier portion is categorized as light work.  Plaintiff did not acquire any skills from any of his prior work that would be transferable to sedentary work.  [Doc. No. 11-2, at pp. 56-58.]  According to the vocational expert, there are 1,000,000 cashier jobs available in the national economy.  [Doc. No. 11-2, at p. 58.]

In response to a hypothetical, Ms. Lasoff testified that an individual of plaintiff's age, education, and past work, who could lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand, or walk for 6 hours in a workday with no other limitations, could not perform any of plaintiff's past relevant work but could perform the cashier job "on its own."  [Doc. No. 11-2, at pp. 58-59.]

### B.   *Summary of Medical Treatment Records.*

On November 1, 2014, plaintiff went to UC San Diego Medical Center complaining of difficulty breathing that had progressed over the last month; mild chest discomfort at times; and mild nausea and dizziness.  [Doc. No. 11-8, at p. 78.]  He was previously able to walk up a large hill near his house daily without fatigue but now has some shortness of breath and must make frequent stops.  He is a heavy smoker; previously used methamphetamine; and has a prior history of heavy alcohol use.  [Doc. No. 11-8, at pp. 79, 87, 90.]  After being diagnosed with congestive heart failure, pulmonary hypertension, and tachycardia, he was discharged with heart failure medications.  [Doc. No. 11-8, at pp. 114, 117.]  Related treatment notes dated

/ / /

December 1, 2014 indicate that plaintiff's prior history of methamphetamine use was the probable cause of his heart problems. [Doc. No. 11-8, at pp. 74-75.]

On January 12, 2015, plaintiff reported to the Heart Failure Clinic for a follow-up visit and stated that he "feels better than he has in the last 6 months and was nearly back to his best exercise capacity in terms of walking, and has now conquered going up a bit of a hill." [Doc. No. 11-8, at p. 71.]

At his next follow-up visit to the Heart Failure Clinic on March 23, 2015, plaintiff reported he was "doing well," was compliant with all medications, had "rare episodes of dizziness x 3 over the past two months," but this may have been the result of taking his medication without food. He was able to ambulate up to 20 to 30 minutes without fatigue or shortness of breath. [Doc. No. 11-8, at pp. 69-70.] The treatment notes state plaintiff is "now on goal dose of Coreq" and tolerated "recent up-titration of Carvedilol well." [Doc. No. 11-8, at p. 70.]

During a June 8, 2015 routine follow-up visit to the Heart Failure Clinic, plaintiff reported taking his medications as prescribed and denied adverse symptoms, such as chest pains and palpitations, but admitted to a relapse in methamphetamine use because of "stress secondary to not having a job." [Doc. No. 11-8, at pp. 63-64.] He can walk an unlimited amount of time on a flat surface but complained of difficulty breathing when walking on an incline. He is unable to climb a flight of stairs without trouble breathing. After taking Coreq, he has lightheadedness if he has not eaten. [Doc. No. 11-8, at p. 63.] Plaintiff's blood pressure was elevated, and the physician expressed concern that "re-initiation" of methamphetamine could cause "worsening heart failure symptoms," so plaintiff was educated on this subject, and he expressed understanding, as well as an ability to take the steps he learned in prior addiction treatment. [Doc. No. 11-8, at p. 64.]

On October 12, 2015, plaintiff went to the Heart Failure Clinic for a routine follow-up visit and reported he was doing well and had been able to tolerate an increase in his prescription for Lisinopril. [Doc. No. 11-8, at p. 60.] He admitted to occasional / / /

1  lightheadedness and dizziness in the mornings that subsides quickly.  He also reported he

2  remains out of work and "doesn't do much during the day."  [Doc. No. 11-8, at p. 60.]

3      Notes from a May 13, 2016 visit to the Heart Failure Clinic state that plaintiff had

4  been taking his medications as prescribed, walks 2 to 3 times per week on flat ground,

5  and hits one hill/slope but has to stop and rest because he "feels it pretty hard."  [Doc.

6  No. 11-8, at p. 47.]  He avoids stairs and walking fast.  At times he feels lightheaded and

7  dizzy.  However, he has no chest pain or tightness, lower extremity swelling, palpitations,

8  or shortness of breath at rest or while lying down.  [Doc. No. 11-8, at p. 47.]  The

9  assessment/plan section of the notes states that plaintiff's ejection fraction is "now

10  normalized on Rx," and he appeared "well compensated from a cardiovascular

11  perspective."  [Doc. No. 11-8, at p. 49.]  However, a right heart catheterization (RHC)

12  procedure was ordered to confirm suspicion of pulmonary arterial hypertension.  [Doc.

13  No. 11-8, at p. 49.]

14      On June 24, 2016, plaintiff went to the Heart Failure Clinic for a follow-up visit,

15  and the notes state that his ejection fraction had improved but there was moderate to

16  severe pulmonary arterial hypertension and shortness of breath that needed further

17  evaluation to determine the cause.  [Doc. No. 11-8, at p. 45.]  He indicated he was

18  compliant with his medications, and had not had any adverse symptoms, such as chest

19  pain or pressure, leg pain, swelling, or fainting.  Plaintiff did report feeling dizzy while

20  walking, but there was improvement, and he was walking about three times per week.

21  [Doc. No. 11-8, at p. 45.]  A pulmonary ejection murmur was noted, and he did appear "a

22  bit anxious," but his mood, affect, and judgment were normal.  [Doc. No. 11-8, at p. 45.]

23  A right heart catheterization (RHC) procedure was ordered again to determine next steps,

24  because the prior order "never got scheduled."  [Doc. No. 11-8, at pp. 43-46.]

25      Notes from USCD's Cardiology Service dated August 5, 2016 state that plaintiff's

26  ejection fraction is "now normalized to 59% with **therapy**."  [Doc. No. 11-8, at p. 35

27  (emphasis in original).]  A Cardiac Catheterization Procedure Report indicates the

28  procedure was completed without complications using an exercise bicycle and the results

indicated there was "dyspnea [*i.e.*, shortness of breath] on exertion." [Doc. No. 11-8, at p. 38.] However, "further exercise" was "limited by groin pain that would require further evaluation." [Doc. No. 11-8, at p. 39.] Cardiopulmonary Exercise Testing was recommended "for a more accurate assessment of VO2 at rest and exercise (when groin pain is no longer a limiting factor)." [Doc. No. 11-8, at p. 39.] A cardiac MRI was also recommended "with contrast to assess for infiltrative disease given known diastolic function (consistent with increased filling pressures with exercise)." [Doc. No. 11-8, at p. 39.]

During an office visit on October 12, 2016, plaintiff reported that he was tolerating the increase in his prescription for Lisinopril well but was only taking his Lasix once a day instead of twice a day as prescribed because of the hot weather. [Doc. No. 11-7, at pp. 8-9.] Plaintiff indicated he occasionally had lightheadedness and dizziness in the mornings that subsides quickly, so he can tolerate it. On flat surfaces, he has no limitation "in regards to dyspnea." [Doc. No. 11-7, at p. 9.] He remains out of work and does not do much during the day. [Doc. No. 11-7, at p. 9.]

On December 9, 2016, plaintiff returned to the Hillcrest Ambulatory Care Center for follow up "after a recent right heart catheterization procedure [RHC] with exercise bicycle." [Doc. No. 11-8, at pp. 33.] Plaintiff's muscle strength, muscle tone, and gait were normal, and he reported he no longer had any groin pain. The groin pain went away on its own and he does not know what caused it, but he reported having to "back off" on yard work. Exercise was "a little easier" but his legs get tired, and he has "a little cramping." [Doc. No. 11-8, at pp. 29-30.] He was feeling "a little better since the last visit but [he] 'tires easily'" and has pain and fatigue in his legs with exertion. [Doc. No. 11-8, at pp. 30-31.] To address plaintiff's complaints of muscle fatigue, the doctor decreased the dosage of Carvedilol and referred him to neurology for further evaluation. [Doc. No. 11-8, at p. 33.]

Plaintiff returned to the Hillcrest Ambulatory Care Center for a one-month follow-up visit on January 6, 2017 regarding changes that were made to his medication. Plaintiff

reported that decreasing his Carvedilol "has not helped much with his fatigue." [Doc. No. 11-8, at p. 24.]  He feels "more tired," still has some cramping in his legs, and is awaiting a neurology appointment to evaluate muscle weakness that occurs with activity. [Doc. No. 11-8, at pp. 24, 27.]  A physical examination revealed normal muscle strength, muscle tone, and gait.  [Doc. No. 11-8, at p. 28.]

At a 6-month follow-up visit on July 21, 2017 at the Hillcrest Ambulatory Care Center, plaintiff said he was feeling improved since decreasing his Carvedilol.  [Doc. No. 11-8, at p. 12.]   He denied swelling, chest pains, fainting, palpitations, dizziness, headache, and depression or anxiety.  [Doc. No. 11-8, at pp. 12, 14.]  "Strength and sensation [were] grossly intact in all four extremities." [Doc. No. 11-8, at p. 14.] Plaintiff reported that decreasing his Carvedilol "has helped much with his fatigue" and "with the improving weather, he has been able to do more exercise." [Doc. No. 11-8, at p. 16.]  His prescriptions for Carvedilol, Lisinopril, and Lasix were continued.  The treatment notes also state plaintiff was still waiting on his referral to neurology "for muscle weakness which occurs with activity." [Doc. No. 11-8, at p. 16.]

On March 19, 2018, plaintiff went to the Hillcrest Ambulatory Care Center, and he reported he was "doing well;" had "no issues" since his last visit; and was taking his medications as prescribed.  He denied chest pains, lightheadedness, fainting, palpitations, lower extremity swelling, and depression but reported pain and fatigue in legs with exertion.  The treatment notes also state that plaintiff's prescription for Carvedilol was decreased about a year ago, and he "has had more energy since doing that." [Doc. No. 11-8, at pp. 6-7.]  Strength and sensation were "grossly intact in all four extremities." [Doc. No. 11-8, at p. 7.]  Current medications (Carvedilol, Lisinopril, and Furosemide) were continued.  [Doc. No. 11-8, at p. 9.]

During a 6-month follow-up visit to the Hillcrest Ambulatory Care Center on October 1, 2018, plaintiff told his cardiologist that he is compliant with all his medications and has some good days and some bad days (*i.e.,* he "can sometimes walk miles without any symptoms" and "some days can only do minimal activity before tiring

out or getting [shortness of breath]").  [Doc. No. 11-9, at p. 57.]  The assessment/plan section of the notes states that plaintiff is "doing o'k," but "some symptoms he is exhibiting are concerning for decline in [ejection fraction] although he appears compensated on exam."  [Doc. No. 11-9, at p. 60.]  Plaintiff's prescriptions were renewed, a repeat echocardiogram was ordered, and plaintiff was advised to return in six months.  [Doc. No. 11-9, at p. 60.]

On March 6, 2019, plaintiff had an office visit at the Family Medical Center and complained of "right knee pain for the past 6-12 months" and described "a sharp pain with pressure when standing or walking."  [Doc. No. 11-9, at p. 94.]  There was no redness or swelling.  [Doc. No. 11-9, at p. 94.]  X-rays were ordered for further evaluation.  [Doc. No. 11-9, at p. 95.]

On June 18, 2019, plaintiff had an office visit at the Family Medical Center and reported a rash on his left inner thigh that was occasionally bleeding.  He said he had been using paper towels to soak up the discharge and indicated he has a history of hidradenitis suppurativa.  He was given a prescription for Bactrim and referred to dermatology for further evaluation.  [Doc. No. 11-9, at p. 99.]

Following a visit to the emergency department on April 18, 2020 for a severe outbreak of his hidradenitis suppurativa, plaintiff had an office visit at the Family Medical Center with Sarah Schuiling, a physician's assistant, on April 23, 2020.  The emergency department had prescribed Mupirocin and Bactrim and the lesions were improving with this treatment, but plaintiff reported there was "still copious amounts of drainage that fill up his bandages by midday."  [Doc. No. 11-9, at p. 100.]  Plaintiff was referred to a dermatologist.  [Doc. No. 11-9, at pp. 100-101.]

During the April 23, 2020 visit, plaintiff also complained that he "is still having pain occasionally [in his right knee] with weight bearing," but he denied any swelling or erythema.  Although he was previously given an order for an x-ray, he "never got the x-ray done," so he was given another x-ray order.  [Doc. No. 11-9, at pp. 100-101.]

///

1   Plaintiff's next office visit with Sarah Schuiling, physician's assistant, was on

2   May 7, 2020.  An EKG completed on this day was "highly abnormal."  [Doc. No. 11-9, at

3   p. 103.]  Previously, he had been seeing his cardiologist every six months, but he was

4   then instructed to return in one year, which would have been October 2020.  However,

5   due to the abnormal EKG, he was encouraged to set up an earlier appointment.  [Doc. No.

6   11-9, at pp. 103, 105.]  The treatment notes for this visit also state that plaintiff had a full

7   range of motion in all four extremities, 5 out of 5 grip strength, and 5 out of 5 strength in

8   his upper and lower extremities.  [Doc. No. 11-9, at p. 104.]  Plaintiff was also given

9   another order for an x-ray, a referral to a second dermatologist, and a referral to urology

10   for his hidradenitis suppurativa.  [Doc. No. 11-9, at p. 105.]

11   After lab results were available, plaintiff was advised in an office visit on May 21,

12   2020 with Sarah Schuiling, physician's assistant, that he was anemic, and he indicated he

13   had been anemic in the past.  [Doc. No. 11-9, at p. 107.]  A full anemia panel was ordered

14   for further evaluation, and plaintiff was given a prescription for ferrous sulfate and told to

15   return in one month for follow up.  [Doc. No. 11-9, at p. 109.]  Based on an x-ray of his

16   right knee which revealed arthritis and patellar mal-tracking, plaintiff was referred to

17   orthopedics "for further management."  [Doc. No. 11-9, at p. 107.]  The treatment notes

18   for this date also indicate plaintiff was advised of the "importance of lifestyle

19   modification" to lower cardiovascular risks, including a heart-healthy diet, regular

20   aerobic exercise, and maintenance of desirable body weight."  [Doc. No. 11-9, at p. 109.]

21   On May 26, 2020, plaintiff was advised that his "iron levels are low, and to keep taking

22   iron medication" that was prescribed.  [Doc. No. 11-9, at p. 110.]

23   On June 8, 2020, plaintiff had an office visit with a cardiologist at UC San Diego

24   Health, who noted that plaintiff's "[a]ctive issues are related to hidradenitis suppurativa

25   not from cardiac disease."  [Doc. No. 11-9, at p. 159.]  There was "no significant change"

26   between recent cardiovascular studies (July 8, 2019) and prior studies (April 4, 2016).

27   Plaintiff was advised to follow up in 6 months.  [Doc. No. 11-9, at p. 159.]

28   / / /

On June 29, 2020, after he completed one month of iron treatment, plaintiff had a follow-up visit with Sarah Schuiling, physician's assistant.  The treatment notes state that plaintiff's "Hgb today was 11.5, in comparison to 11.2 in 5/7."  [Doc. No. 11-9, at p. 111.]  He was given a new prescription for ferrous sulfate to treat his anemia.  [Doc. No. 11-9, at p. 112.]  Plaintiff reported that he was scheduled to have surgery on July 30, 2020 for his hidradenitis suppurativa and had been to his cardiologist.  The cardiologist had explained to him that "he will always have an abnormal EKG but that [he] is doing 'just fine.'"  [Doc. No. 11-9, at p. 111.]  The treatment notes for this date also state that disability paperwork was completed indicating plaintiff is "not able to lift more than 10 pounds or stay in same position, whether sitting or standing, for more than 2 hours at a time due to his severe [hidradenitis suppurativa] and pain."  [Doc. No. 11-9, at p. 112.]

On July 30, 2020, plaintiff had surgery for excision of his hidradenitis suppurativa lesions "without incident."  He was discharged to a skilled nursing facility for "complex wound management."  [Doc. No. 11-9, at pp. 113, 118.]  Physical examination notes on this date state as follows:  "Swollen R knee, no erythema or warmth in the knee."  [Doc. No. 11-9, at p. 128.]

### C.   *Summary of Medical Opinions.*

#### 1.   *George G. Spellman, Jr., M.D./Jay Shaw, M.D.*

In December 2018, plaintiff's medical records were reviewed by Dr. Spellman and Dr. Shaw, agency physicians, who concluded that plaintiff had some limitations that precluded him from performing prior work, but that he was not disabled because his medical condition was not severe enough to keep him from performing light work.  [Doc. No. 11-3, at pp. 15-16.]  The evaluations by these physicians include notations indicating the record lacked evidence of a disability from June 1, 2014, which is plaintiff's original date of onset, through October 30, 2014.  [Doc. No. 11-3, at p. 8.]  In this regard, the Court notes that the available medical records begin on November 1, 2014, when plaintiff went to UC San Diego Medical Center complaining of shortness of breath on exertion / / /

15

1   and mild chest discomfort, which resulted in the diagnosis of congestive heart failure.

2   [Doc. No. 11-8, at p. 78.]

3     In reaching their conclusion that plaintiff was capable of light work, Dr. Spellman

4   and Dr. Shaw relied in part on plaintiff's improved cardiac function and symptoms;

5   unremarkable physical examinations; and an absence of evidence to support any

6   limitations related to knee pain.  [Doc. No. 11-3, at pp. 8, 9, 12.]  Additionally, there are

7   notations indicating that plaintiff's date last insured was a factor.  [*See, e.g.*, Doc. No. 11-

8   3, at p. 8 ("11/1/14 thru DLI clmt should be capable of light RFC").]  Inconsistent

9   statements were also noted in the evaluations of these physicians because plaintiff told

10  his cardiologist that he was "sometimes able to walk miles," but he made other

11  statements indicating he was in constant pain, was spending most of his days lying down,

12  and sometimes had to use a cane.  [Doc. No. 11-3, at p. 8.]

13      **2.** ***L. Tanaka, M.D.***

14    After plaintiff's disability claim was denied, Dr. Tanaka reviewed plaintiff's

15  medical records in connection with his request for reconsideration that was submitted on

16  February 27, 2019.  At this time, plaintiff updated his disability claim by indicating he

17  was having increased pain in his knees and was experiencing depression.  [Doc. No. 11-3,

18  at p. 35.]  Dr. Tanaka's review of plaintiff's medical records, which was completed as of

19  April 19, 2019, states that no additional medical records were available to support

20  plaintiff's claims of increasing pain and limited mobility in his knees.  [Doc. No. 11-3, at

21  p. 39.]  However, a consultation with a mental health professional was requested because

22  of plaintiff's new complaint of depression.  The evaluation only indicated plaintiff may

23  have "some limitation in delayed memory," which suggests he is capable of "unskilled

24  work with occasional public interaction."  [Doc. No. 11-3, at pp. 35, 40.]  As of

25  December 31, 2015, plaintiff's date last insured, Dr. Tanaka concluded plaintiff was

26  capable of light work.  [Doc. No. 11-3, at p. 40.]

27    As part of this evaluation, Dr. Tanaka completed an RFC assessment for the period

28  November 1, 2014 (when plaintiff first complained of heart problems) through

December 31, 2015 (plaintiff's date last insured) and concluded plaintiff could lift 10 pounds frequently and 20 pounds occasionally; stand, walk, or sit for about 6 hours in an 8-hour workday; and did not have any postural, manipulative, visual, communicative, or environmental limitations.  [Doc. No. 11-3, at pp. 43-44.]  In sum, Dr. Tanaka concluded plaintiff is not disabled because he has the RFC to perform light work.  [Doc. No. 11-3, at p. 47.]

### 3. *Sarah Schuiling, Physician's Assistant.*

The record includes a Medical Source Statement form signed by a certified physician's assistant, Sarah Schuiling, on June 29, 2020, which indicates that she first became involved in plaintiff's treatment on April 23, 2020.  [Doc. No. 11-9, at p. 82.] The form states that plaintiff is weak and tired because of his congestive heart failure, anemia, and hidradenitis suppurativa and is also uncomfortable sitting for more than 2 hours at a time because of his hidradenitis suppurativa.  [Doc. No. 11-9, at p. 82.]

The form completed by Ms. Schuiling also states that plaintiff should not lift and carry more than 10 pounds or stand and walk for more than 2 hours in a workday. Because he has open wounds and "severe pain" from hidradenitis suppurativa, the form further states that plaintiff should alternate between sitting and standing every 2 hours. According to the form, plaintiff was expected to have surgery to address his hidradenitis suppurativa, and the wounds cause severe pain.  Because hidradenitis suppurativa is susceptible to temperature changes, movement, and uncomfortable environments, the form recommends plaintiff avoid heights, moving machinery, and temperature changes. In addition, the form predicts plaintiff would be absent from work about 3 times a month and off task more than 20 percent of a workday because the hidradenitis suppurativa impacts him on a constant, daily basis.  His long-term prognosis was dependent on the success of the surgery.  [Doc. No. 11-9, at pp. 82-85.]

/ / /

/ / /

/ / /

*V.*   ***Discussion.***

    *A.*   ***Identification of a Single Occupation.***

Citing the Ninth Circuit's decision in *Lounsberry v. Barnhart*, 468 F.3d 1111 (9ᵗʰ Cir. 2006), plaintiff argues that the ALJ's decision should be reversed and remanded for an award of benefits, because the ALJ only identified the single occupation of cashier/checker that he can perform.  Based on *Lounsberry*, plaintiff argues that the ALJ must identify a "significant range of work" that he can perform to support a determination that he is not disabled.  [Doc. No. 12-1, at pp. 7-8.]  Essentially, plaintiff's argument is that the ALJ committed legal error by incorrectly applying the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, also known as "the grids."

The ALJ in *Lounsburry*, 468 F.3d at 1111, found the plaintiff was not disabled because she retained the residual functional capacity for light work, had some transferable skills, and could perform "a single occupation that existed in significant numbers in the economy."  *Id.* at 1112, 1116.  In reaching this conclusion, the ALJ "declined to apply the grids, except as an advisory framework," but the Ninth Circuit concluded this was error.  *Id.* at 1116.  According to the Ninth Circuit, "the ALJ should have first inquired if *Lounsburry* was disabled under the grids on the basis of her exertional limitations alone.  The ALJ also relied on testimony from the vocational expert in concluding that *Lounsburry* was not disabled.  This was also error; the ALJ should not have substituted extrinsic evidence for the mandatory analysis under the grids.  [¶] . . . It is Social Security Administration policy that the ALJ may not look to other evidence to rebut this conclusion.  Soc. Sec. Rul. 83-5a.  Under no circumstances may a vocational expert's testimony supplant or override a disability conclusion directed by [the grids]."  *Id.* at 1116.

Instead, the ALJ in *Lounsberry* should have turned to Rule 202.07 and Rule 202.00(c) of the grids.  Although Rule 202.07 indicates that an individual of advanced age with transferable skills is "not disabled," the Ninth Circuit concluded this rule must

be read together with Rule 202.00(c).  Rule 202.00(c) states that individuals of advanced age who can no longer perform past relevant work are disabled if they "*have only skills that are not readily transferable to a significant range of semi-skilled or skilled work*." *Id.* at 1116-1117 (emphasis in original).  According to the Ninth Circuit, *Lounsburry* was clearly disabled under the grids, because "work" under Rule 202.00(c) "means distinct occupations" and a single occupation "does not constitute a significant range of work." *Id.* at 1117.  In a more recent case, *Maxwell v. Saul*, 971 F.3d 1128 (9th Cir. 2020), the Ninth Circuit held that "two occupations do not constitute a significant range of work" under the Medical-Vocational Guidelines.  *Id.* at 1129, 1131.

Here, the circumstances are distinguishable from those at issue in *Lounsburry*, where Rule 202.07 and Rule 202.00(c) of the Medical-Vocational Guidelines applied because the claimant qualified for the "advanced age" category.  In this case, *Lounsburry* is not determinative, because plaintiff fell into the category of "closely approaching advanced age" on his date last insured.[2]  As noted above, the ALJ's decisions states that plaintiff "meets the insured status requirements of the Social Security Act only through December 31, 2015." [Doc. No. 11-2, at p. 36 (emphasis added).]  The record indicates plaintiff was born on July 29, 1964, so he was 51 years old on his date last insured.  [Doc. No. 11-5, at p. 2.]  For purposes of the Medical-Vocational Guidelines, individuals aged 50 to 54 are "closely approaching advanced age."  20 CFR 404.1563(d).  Therefore, the ALJ applied Rule 202.12 of the Medical-Vocational Guidelines.  [Doc. No. 11-2, at p. 42.]  Under Rule 202.12, an individual who remains capable of light work, is closely

---

[2]    In his Motion for Summary Judgment, plaintiff states that he reached the "advanced age" category on July 29, 2019 at age 55.  [Doc. No. 12-1, at p. 8.]  For this reason, he amended his disability "onset date" to July 29, 2019.  [Doc. No. 12-1, at p. 8.] However, this amended date does not impact the outcome here, because plaintiff's date last insured is December 31, 2015, and he did not qualify for the "advanced age" category on this date.

approaching advanced age, has a limited education, a history of skilled or semi-skilled work, and transferable skills is not disabled.[3]

The Court notes that the vocational expert at the initial hearing on July 22, 2020 testified that cashier is an "unskilled" job, so there would not be any transferable skills. [Doc. No. 11-2, at p. 118.]  Additionally, Social Security regulations state that:  "A person does not gain work skills by doing unskilled jobs."  20 C.F.R. § 404.1568(a). Based on this information, it is debatable whether plaintiff had any transferable skills.  If there were no transferable skills, the ALJ should have applied Rule 202.11 of the Medical-Vocational Guidelines, but the result would be the same.  Under Rule 202.11, an individual who remains capable of work, is closely approaching advanced age, has a limited education, a history of skilled or semi-skilled work, but no transferable skills is not disabled.

Based on the foregoing, the Court rejects plaintiff's argument that his case should be reversed and remanded based on the Ninth Circuit's decision in *Lounsburry v. Barnhart*, 468 F.3d at 1111, and the application of the Medical-Vocational grids to his circumstances.  The Ninth Circuit's decision in *Lounsburry* is not determinative here, because the facts at issue are distinguishable.  The claimant in *Lounsburry* qualified for the category of "advanced age," and plaintiff in this case only qualified for the category of "approaching advanced age" on his date last insured.

**B.    _Anemia._**

According to plaintiff, the ALJ rejected his anemia as a medically determinable severe impairment, because he thought it "was only suggested" and not "objectively

---

[3]    "The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competences for unskilled work."  Rule 202.00(b), Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.

verified." [Doc. No. 12-1, at pp. 9-10.]    Plaintiff argues this was error because his anemia was medically corroborated by objective blood panel testing.  In addition, plaintiff contends the ALJ should have concluded that his anemia is a severe impairment, because it has a significant impact on his ability to perform light work. [Doc. No. 12-1, at p. 10.]  In support of this argument, plaintiff cites the opinion of Ms. Schuiling, a physician's assistant, which states that plaintiff "is weak & fatigued due to [congestive heart failure] & anemia."  [Doc. No. 12-1, at p. 10, citing Doc. No. 11-9, at p. 82.]

Regarding plaintiff's claim of anemia as a severe impairment, the ALJ's decision states as follows:

> The record does not establish anemia.  The claimant only reported that he was told that he was anemic in the past (*e.g.*, Exhibit 8F/22).  In May 2020, a full anemia panel was drawn for further evaluation and he was started on ferrous sulfate (Exhibit 8F/24).  In June 2020, he was taking Vitamin B12 and continued to take Ferrous sulfate.
>
> ****
>
> As for anemia there are no clinical signs or symptoms that even support a severe impairment.

[Doc. No. 11-2, at p. 36.]

Disability claimants are required "to make a threshold showing that their 'medically determinable' impairments are severe enough to satisfy the regulatory standards." *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987).  "The term 'disability' means—(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or ***which has lasted or can be expected to last for a continuous period of not less than 12 months***. . . ."  42 U.S.C. § 423(1)(A) (emphasis added).  *See also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193-1194 (9th Cir. 2004) (the claimant "has the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has

/ / /

lasted or can be expected to last for a continuous period of not less than 12 months.'  42 U.S.C. § 423(d)(1)(A).")

The record does include objective medical evidence of anemia.  On April 23, 2020, plaintiff was instructed to return to the clinic after fasting for a "full panel of lab work."  [Doc. No. 11-9, at p. 102.]  During a return office visit on May 21, 2021, plaintiff was advised he was anemic based on the results of blood testing, and he responded that "he has been told he was anemic in the past," but he was not sure "whether he had iron deficiency anemia."  [Doc. No. 11-9, at p. 107.]  A full anemia panel was then drawn in the clinic for further evaluation and plaintiff was prescribed ferrous sulfate for treatment of his anemia.  [Doc. No. 11-9, at p. 109.]  After one month of treatment, plaintiff returned to the clinic on June 29, 2020.  The treatment notes state that plaintiff's "Hgb today was 11.5, in comparison to 11.2 [on] 5/7."  [Doc. No. 11-9, at p. 111.]  In other words, there was some improvement with treatment.  The treatment notes also state plaintiff "has been told he has anemia for years now."  [Doc. No. 11-9, at p. 111.]

Although the medical treatment records suggest plaintiff may have been anemic on a long-term basis, there is no objective medical evidence (*i.e.*, laboratory results) in the record to support this suggestion or to support a conclusion that anemia was a severe impairment as of or prior to the date last insured.  Rather, the objective evidence in the record indicates that plaintiff's anemia was not diagnosed until May 21, 2020, which is long after December 31, 2015, his date last insured.  Treatment for anemia then began on May 21, 2020, and continued through June 29, 2020.  There do not appear to be any subsequent medical records addressing anemia.  Nor is there any evidence to indicate plaintiff's anemia was untreatable or severe enough during the relevant time to justify imposing any additional limitations that were not already included in the ALJ's residual functional capacity assessment.  Additionally, as discussed more fully below, the ALJ had specific and legitimate reasons for discounting the opinion of Ms. Schuiling.  Although the ALJ's decision could have been more specific, this Court cannot disagree

1   with the conclusion that "[t]he record does not establish anemia" as a severe

2   impairment.  [Doc. No. 11-2, at p. 36.]

3       **C.      *Residual Functional Capacity Assessment.***

4           Plaintiff argues that the ALJ's residual functional capacity assessment is not

5   supported by substantial evidence, because the agency physicians who reviewed his

6   records did not consider subsequent evidence about his right knee, so their opinions that

7   plaintiff could perform "light work" were necessarily "based on the exclusion of the

8   right knee as not being a medically determinable impairment."  [Doc. No. 12-1, at

9   p. 12.]  Therefore, it is plaintiff's view that the ALJ should not have relied on the

10  opinions of the state agency physicians to support a conclusion he could perform light

11  work.  [Doc. No. 12-1, at p. 12.]

12          At step 3, the ALJ included "right knee pain" in a list of plaintiff's severe

13  impairments, but he determined there was a lack of clinical findings to support a

14  conclusion that plaintiff had disabling knee pain.  [Doc. No. 11-2, at pp. 36, 39.]  In

15  support of this conclusion, the ALJ referred to treatment notes from April 2020

16  indicating plaintiff had "occasional right knee pain with weight-bearing on the right knee

17  and denied any swelling or erythema (Exhibit 8F/15)."  [Doc. No. 11-2, at p. 38.]  The

18  ALJ also referred to other parts of the record indicating plaintiff had a normal range of

19  motion in his joints with swelling only noted in July 2020 (Exhibit 9F/15).  [Doc. No.

20  11-2, at p. 38.]  In support of the RFC assessment, the ALJ's decision notes that plaintiff

21  complained of knee pain but had "mostly normal examinations of the knees other than

22  occasional finding of swelling of the right knee."  [Doc. No. 11-2, at p. 41.]

23  Additionally, the ALJ's decision states as follows:  "The limit to light work without

24  additional non-exertional limit is supported by the claimant's normal gait and that he

25  does not need any assistive device to ambulate."  [Doc. No. 11-2, at p. 41.]

26          As noted above, the state agency physicians completed their evaluations in

27  December 2018 and April 2019, so it is true they could not have reviewed the treatment

28  records from 2020 that were referenced by the ALJ.  However, substantial evidence still

supports the ALJ's determination that plaintiff did not have disabling knee pain and was capable of light work.  As noted above, plaintiff has the burden of proof at steps one through four and was required to submit evidence to show he suffered from a disabling condition or conditions on or before December 31, 2015, his date last insured.  As outlined above, the available medical treatment records begin on November 1, 2014, so there is nothing in the record to indicate plaintiff suffered from disabling knee pain prior to this time.  Additionally, plaintiff has not cited, and the Court was unable to locate, any medical treatment records from November 1, 2014 through December 31, 2015, the date last insured, that could establish plaintiff had disabling knee pain during this time period.  Rather, the record suggests plaintiff's right knee pain began after December 31, 2015, because treatment notes dated March 6, 2019, state that plaintiff had an office visit at the Family Medical Center and complained of "right knee pain for the past 6-12 months" . . . ."  [Doc. No. 11-9, at p. 94.]

Plaintiff also argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence, because the ALJ acknowledged in his decision that plaintiff's hidradenitis suppurativa is a severe impairment, but the state agency physicians did not mention or consider this impairment in their analysis.  Therefore, plaintiff contends the ALJ should not have accepted the opinions of the state agency physicians that plaintiff could perform light work.  [Doc. No. 12-1, at p. 14.]

As plaintiff contends, the ALJ at step 3 listed hidradenitis suppurativa as a "severe impairment."  [Doc. No. 11-2, at p. 36.]  However, he concluded this medical condition did not impact plaintiff's ability to perform light work, because "[m]ost examinations of his skin show . . . no evidence of rash or lesions. . . ."  [Doc. No. 11-2, at p. 38.]  The ALJ's RFP assessment also takes into consideration that plaintiff's history of hidradenitis suppurativa "manifested primarily in the pelvic/grown region with mostly normal clinical findings of the skin and very conservative treatment other than minor surgical excision of [his] lesions in July 2020 without complication or residual."  [Doc. No. 11-2, at p. 41.]  Although he has the burden of proof, plaintiff did

21cv1691-KSC

not cite, and the Court was unable to locate, any evidence in the medical treatment records indicating plaintiff's hidradenitis suppurativa had any impact on his ability to work prior to December 31, 2015, his date last insured.

Because the state agency physicians completed their evaluations in December 2018 and April 2019, it is true they could not have reviewed the treatment records from 2020 that relate to plaintiff's "severe outbreak" of hidradenitis suppurativa. However, substantial evidence still supports the ALJ's residual functional capacity assessment concluding that plaintiff can perform light work. As the ALJ noted, the record shows that "[m]ost examinations of his skin show . . . no evidence of rash or lesions. . . ." [Doc. No. 11-2, at p. 38.] He then had a severe outbreak of his hidradenitis suppurativa that began around April 18, 2020. [Doc. No. 11-9, at p. 100.] On July 30, 2020, about three months after the outbreak began, the treatment records indicate plaintiff had surgery for his hidradenitis suppurativa lesions "without incident." [Doc. No. 11-9, at pp. 113, 118.] There is nothing to indicate there was anything but a full recovery. Thus, without more, the ALJ was entitled to draw the inference that plaintiff's hidradenitis suppurativa is not a disabling condition. Rather, the record indicates there are significant periods when this condition is in remission with no impact on plaintiff's ability to work.

In sum, the Court is unconvinced by plaintiff's contention that the ALJ's RFC assessment is flawed because it relies on the opinions of agency physicians who completed their evaluations in December 2018 and April 2019, which could not have included consideration of subsequent medical records from 2019 and 2020. These later treatment records from 2019 and 2020 did not include evidence that could have established plaintiff was disabled prior to December 31, 2015, his date last insured. Under the circumstances presented, this Court concludes that the ALJ's RFC assessment is supported by substantial evidence.

/ / /

/ / /

21cv1691-KSC

### D.     *Opinion Evidence by Sarah Schuiling, Physician's Assistant.*

Plaintiff argues that the ALJ failed to properly evaluate the opinion of a treating source, Sarah Schuiling, which would have warranted a conclusion that plaintiff qualified for disability benefits.  As outlined more fully above, Ms. Schuiling completed a handwritten Medical Source Statement on June 29, 2020, after she became involved with plaintiff's treatment on April 23, 2020, and while plaintiff had active lesions and "severe pain" from his hidradenitis suppurativa and was awaiting surgery.  [Doc. No. 11-9, at p. 82.]  Essentially, Ms. Schuiling's opinion was that plaintiff could not work because he was weak and tired from his congestive heart failure and anemia and uncomfortable because of the hidradenitis suppurativa lesions.  [Doc. No. 11-9, at pp. 82-85.]

"[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.  The agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, *id.* § 404.1520c(b)(2)."  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

The ALJ concluded the opinions expressed by Ms. Schuiling were "not persuasive" for several reasons.  First, her initial contact with plaintiff was April 23, 2020, so she had only been involved in his treatment for about two months when she completed the form.  Second, the lift and carry restrictions on the form were based on plaintiff's report of weakness and fatigue due to congestive heart failure and anemia, but the cardiology treatment notes and other treating sources "document no significant cardiovascular symptoms during the period in adjudication."  [Doc. No. 11-2, at p. 40.]  Cardiovascular examinations and testing were "normal."  [Doc. No. 11-2, at p. 40.]  Third, the sitting and standing restrictions on the form were based on the claimant's reports of being "very uncomfortable" due to hidradenitis suppurativa lesions, but most examinations of plaintiff's skin had been normal other than the severe outbreak which

required minor surgery in July 2020. [Doc. No. 11-2, at p. 40.] Fourth, the ALJ noted that the "movement restrictions" listed on the form conflicted with advice given by Ms. Schuiling in May 2020 for plaintiff to modify his lifestyle with regular aerobic exercise. [Doc. No. 11-2, at p. 40.]

Plaintiff argues that the ALJ did not apply the "correct legal standards in evaluating Schuiling's opinions," because factors related to the treatment relationship are only considered "when two or more differing opinions are equally persuasive." [Doc. 12-1, at p. 16.] In this Court's view, plaintiff misreads the applicable standards. The rules governing how medical opinions are evaluated are set forth in 20 C.F.R. § 404.1520c, which states in part as follows: "We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources." 20 C.F.R. § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions . . . are supportability . . . and consistency . . . ." 20 C.F.R. § 404.1520c(b). Other relevant factors that "will" be considered include the length, purpose, and extent of the treatment relationship; the frequency of examinations; the area of specialty of a treating source; and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). In sum, the ALJ was entitled to consider factors related to the treatment relationship in his decision.

Citing the Ninth Circuit's decision in *Benton v. Barnhart*, 331 F.3d 1030, 1037-1039 (9th Cir. 2003), plaintiff argues there is no validity to the ALJ's rejection of Ms. Schuiling's opinion based on the short length of the treatment relationship, because "four years" of treating records were available to her, and "[a] medical source's opinions can stand on the records of the treating team." [Doc. No. 12-1, at p. 16.] However, *Benton* is not analogous here. The opinion at issue in *Benton* involved the use of a team treatment approach in a mental health setting and the opinion of a physician who was "transmitting both his own knowledge and opinion" and the opinions of the medical treatment team "under his supervision." *Id.* at 1039. Here,

analogous facts are not apparent on the record.  Once again, under 20 C.F.R. § 404.1520c, the ALJ was entitled to consider the length and extent of the treatment relationship Ms. Schuiling had with plaintiff in his decision.

Next, plaintiff contends the ALJ erroneously rejected Ms. Schuiling's opinion that he was unable to lift and carry more than 10 pounds due to weakness and fatigue from his congestive heart failure and anemia, because his electrocardiogram results were "highly abnormal" on May 7, 2020.  [Doc. No. 12-1, at p. 17.]  However, this argument overlooks information in a later treatment note from June 29, 2020, when plaintiff told Ms. Schuiling that his cardiologist explained that "he will always have an abnormal EKG but that [he] is doing 'just fine.'"  [Doc. No. 11-9, at p. 111.]

Plaintiff also disagrees with the third and fourth reasons the ALJ cited to support his conclusion that Ms. Schuiling's opinions were not persuasive.  As outlined more fully above, the ALJ's third reason cites a perceived contradiction between Ms. Schuiling's advice to plaintiff during an office visit on May 21, 2020 that he should maintain a healthy lifestyle, including regular aerobic exercise, to lower his cardiac risk, and her statements on the form dated June 29, 2020 indicating plaintiff could not sit for long and needed to alternate between sitting and standing because his hidradenitis suppurativa lesions were "very uncomfortable."  [Doc. No. 11-2, at p. 40.]  As this Court reads it, the ALJ's point is that Ms. Schuiling's opinion is not persuasive, because she must have believed plaintiff was capable of regular aerobic exercise despite his congestive heart failure and hidradenitis suppurativa lesions.  In this regard, the Court notes that plaintiff's outbreak of hidradenitis suppurativa lesions was treatable, as plaintiff was awaiting surgery to address the lesions when Ms. Schuiling completed the form.

The fourth reason cites postural, manipulative, environmental, and other work limitations recommended by Ms. Schuiling "based on the severity" of plaintiff's hidradenitis suppurativa outbreak compared with "most examinations of the claimant's skin" which "have been normal other than around July 2020 when the claimant

21cv1691-KSC

underwent minor surgical excision of his [hidradenitis suppurativa] lesions in the pelvic groin region." [Doc. No. 11-2, at p. 40.]  As this Court reads it, the ALJ's point is that Ms. Schuiling's opinions are not persuasive, because the record indicates that plaintiff's skin is typically "normal" and his hidradenitis suppurativa only impacts his ability to work on an occasional, temporary basis when he has a severe outbreak of lesions.

In sum, this Court cannot disagree with the ALJ's conclusion that the opinions expressed by Ms. Schuiling on the Medical Source Statement dated June 29, 2020 are unconvincing.  The ALJ's reasons for finding Ms. Schuiling's opinions unpersuasive are supported by substantial evidence.

### *Conclusion*

Based on the foregoing, plaintiff's Motion for Summary Judgement seeking a reversal and remand is DENIED [Doc. No. 12], and defendant's Cross-Motion for Summary Judgment seeking affirmance of the final decision of the Commissioner is GRANTED [Doc. No. 15], because the ALJ's non-disability determination is supported by substantial evidence.  The Clerk of the Court shall enter judgment against plaintiff and in defendant's favor and terminate the case.

IT IS SO ORDERED.

Dated:  March 13, 2023

Hon. Karen S. Crawford
United States Magistrate Judge

21cv1691-KSC